**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
　　　　　*Plaintiff-Appellee,*

　　　　v.

DWIGHT GILCHRIST, a.k.a. David
Bangsberg, a.k.a. Michael Colston,
a.k.a. Bruce Gilchrist,
　　　　　*Defendant-Appellant.*

No. 09-10250

D.C. No.
3:06-cr-00538-SI-1

OPINION

Appeal from the United States District Court
for the Northern District of California
Susan Illston, District Judge, Presiding

Argued and Submitted
January 11, 2011—San Francisco, California

Filed October 3, 2011

Before: Mary M. Schroeder, Johnnie B. Rawlinson, and
Carlos T. Bea, Circuit Judges.

Opinion by Judge Bea

18659

## COUNSEL

Tracie L. Brown, Esq., Assistant U.S. Attorney, OFFICE OF THE U.S. ATTORNEY, San Francisco, California, for the plaintiff-appellee.

Robert Frederick Waggener, San Francisco, California, for the defendant-appellant.

## OPINION

BEA, Circuit Judge:

Dwight Gilchrist appeals his sentence of 25 months' imprisonment plus five years of supervised release following his guilty plea to ten counts of embezzlement under 18 U.S.C. § 656, and eight counts of bank fraud under 18 U.S.C. § 1344.

The eighteen counts Gilchrist pleaded guilty to relate to two schemes to defraud Wells Fargo: an embezzlement scheme and a check-kiting scheme. His primary contention is that because he did not know he was the subject of a pending criminal investigation at the time he committed perjury in a civil suit concerning the very same conduct later charged in the criminal Indictment, the district court erred in applying U.S.S.G. § 3C1.1 to enhance his sentence for wilfully obstructing justice. We have jurisdiction under 18 U.S.C. § 3231, and we affirm.

## I.    The Facts

### A.    Embezzlement (Counts 1-10)

On November 1, 1997, Dwight Gilchrist—claiming to be "Michael Colston"—got a job with Wells Fargo in its Overdraft Collections Unit. During March 1998, he accessed Wells Fargo's computer system and added his real name, Dwight Gilchrist, as an authorized account holder on more than a dozen accounts, including accounts not charged in the Indictment. Gilchrist then withdrew cash from these accounts, in amounts ranging from $750 to $2,000.

When Wells Fargo discovered what had happened, a Wells Fargo fraud investigator went to speak to him about the addition of the name Dwight Gilchrist to the compromised accounts. As soon as the Wells Fargo fraud investigator mentioned his real name, Gilchrist suddenly got up and left the building, never to return. The total amount of actual loss resulting from Gilchrist's embezzlement scheme was $13,100.

### B.    Bank Fraud (Counts 11-18)

More than a year after this series of embezzlements, Gilchrist again defrauded Wells Fargo, this time engaging in a lengthy and elaborate check-kiting[1] scheme. Beginning in late

---

[1]Check-kiting "is the practice of playing one checking account against another, taking advantage of bank processing delays. It creates the appear-

1999, Gilchrist opened more than a dozen Wells Fargo bank accounts using either his own name, one of his various aliases (such as "David Bangsberg"), or an account purportedly "doing business as" one of his aliases (such as "Bruce Gilchrist dba Bruce's Memos N Photos").

Gilchrist used Social Security numbers stolen from other individuals to create two of his aliases. He also acquired and used multiple California driver's licenses in names such as "Michael Colston," "Bruce Gilchrist," and "David Bangsberg."

Gilchrist then created checks from non-existent or closed accounts belonging to other individuals. He made these checks payable to a false identity or business, deposited them into one of the bank accounts he had created, and then withdrew a portion of the funds before Wells Fargo realized that the deposited checks should not be cleared. These transactions, charged in Counts 11 to 18 of the Indictment, took place from February 2000 to May 2001. In all, Gilchrist deposited nearly 60 fraudulent checks into his various accounts, totaling $269,679.78.

## C.   The FBI's Investigation and Gilchrist's Perjury

After making two fraudulent withdrawals from his own account as charged in Counts 11 and 12 of the Indictment, Gilchrist submitted "fraud claim reports" to Wells Fargo, falsely claiming that the fraudulent transactions were actually made by an unknown thief who had broken into Gilchrist's car and stolen his wallet, identification, ATM card, and Wells Fargo bank information. Counts 11 and 12 of the Indictment charge that Gilchrist fraudulently withdrew $8,000 and then

---

ance of funds present and immediately available for withdrawal, when none in fact are there." *United States v. Turner*, 312 F.3d 1137, 1139 n.1 (9th Cir. 2002).

$8,750 from two different Wells Fargo accounts that did not belong to him, one on February 28, 2000 and one on February 29, 2000.

Gilchrist then failed to cooperate with Wells Fargo's investigation of his fraud claim reports. When Wells Fargo rejected his fraud claim reports, Gilchrist commenced a civil action against Wells Fargo to recover the amount of money he had already stolen from his phony account, by means of the fraudulent withdrawals later charged in Counts 11 and 12 of the Indictment.

Wells Fargo reported Gilchrist's fraudulent activities to the FBI, which opened its investigation in June 2001, five months before Gilchrist committed perjury.

In November 2001, Gilchrist gave a deposition in his civil case against Wells Fargo in which he testified under oath that a thief had stolen his bank information and was responsible for the fraudulent withdrawals; Gilchrist also repeatedly lied about his Social Security number and whether he had ever had a California driver's license.

## D.   Gilchrist's Guilty Plea

Gilchrist pleaded guilty to all eighteen counts in the Indictment, without a plea agreement. He pleaded guilty to ten counts of embezzlement under 18 U.S.C. § 656, which provides in relevant part:

> Whoever, being an officer, director, agent or employee of, or connected in any capacity with any Federal Reserve bank, member bank, depository institution holding company, national bank, insured bank, branch or agency of a foreign bank, or organization operating under section 25 or section 25(a) of the Federal Reserve Act, or a receiver of a national bank, insured bank, branch, agency, or organization

or any agent or employee of the receiver, or a Federal Reserve Agent, or an agent or employee of a Federal Reserve Agent or of the Board of Governors of the Federal Reserve System, embezzles, abstracts, purloins or willfully misapplies any of the moneys, funds or credits of such bank, branch, agency, or organization or holding company or any moneys, funds, assets or securities intrusted to the custody or care of such bank, branch, agency, or organization, or holding company or to the custody or care of any such agent, officer, director, employee or receiver, shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both; but if the amount embezzled, abstracted, purloined or misapplied does not exceed $1,000, he shall be fined under this title or imprisoned not more than one year, or both.

18 U.S.C. § 656.

Gilchrist also pleaded guilty to eight counts of bank fraud under 18 U.S.C. § 1344, which provides:

Whoever knowingly executes, or attempts to execute, a scheme or artifice—

(1) to defraud a financial institution; or

(2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises;

shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

18 U.S.C. § 1344.

## E.   The Sentencing Hearing

Because the district court could have sentenced Gilchrist to 30 years' imprisonment for even one count of bank fraud, his sentence of 25 months' imprisonment is clearly below the statutory maximum.

The Pre-Sentence Report recommended the district court find the intended loss amount was $294,779.78, representing the sum of (1) the $13,100 Gilchrist embezzled while acting as Wells Fargo employee "Michael Colston," (2) the $269,679.78 in documented bad checks during Gilchrist's extensive check-kiting fraud scheme (as set forth on the government's detailed spreadsheet), and (3) a $12,000 loss associated with a Wells Fargo account not charged in the Indictment (which Gilchrist did not dispute was relevant conduct). Because the intended loss was over $200,000, the government and the Pre-Sentence Report urged a finding that the loss amount supported an eight-level enhancement under U.S.S.G. § 2F1.1(b)(1)(I) (2000).

The district court found the government proved that the nearly sixty fraudulent checks deposited by Gilchrist totaled an intended loss amount of more than $200,000. The government presented evidence of the bank account, check number, and bates number for each fraudulent deposit Gilchrist made.

The district court also found Gilchrist was subject to a two-level enhancement for obstruction of justice under U.S.S.G. § 3C1.1, in light of his "very serious" misconduct in filing a fraudulent lawsuit against Wells Fargo, and repeatedly lying under oath.

Having calculated a total offense level of 16, a criminal history category of I, and a resulting Guidelines range of 21-27 months, the district court stated that it was "inclined to sen-

tence [Gilchrist] to 27 months," the high end of the Guidelines range. Calling this case a "terrible crime," the district court referred specifically to the very serious damage done to one of the many individuals whose private information Gilchrist stole in the course of committing bank fraud, as well as Gilchrist's "fraudulent" lawsuit against victim Wells Fargo. After listening to the arguments of counsel and Gilchrist's statement on his own behalf, the district court revised its initial inclination and imposed a sentence of 25 months.

## II.   The Intended Loss Was More Than $200,000

Gilchrist argued to the district court that the spreadsheet presented by the government detailing each fraudulent check "was not a fair guideline threshold given the overall circumstances of this case."

Gilchrist claims there was plain error even though he did not object at trial. Plain error is "(1) error, (2) that is plain, and (3) that affects substantial rights." *United States v. Cotton*, 535 U.S. 625, 631 (2002) (internal quotation marks omitted) (citations omitted). If these three conditions of the plain error test are met, we may exercise our discretion to notice a forfeited error that (4) "seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id*. at 631.

[1] Under the Guidelines, the "intended loss" of the embezzlement and bank fraud schemes is relevant in determining the offense level. Because the district court determined that the intended loss was over $200,000, the loss amount supported an eight-level enhancement under U.S.S.G. § 2F1.1(b)(1)(I) (2000). The district court's determination is supported by substantial evidence because the government submitted a spreadsheet showing check and bates number for all fraudulent checks, as well as the account number into which each fraudulent check was deposited, which demonstrated that Gilchrist deposited nearly 60 fraudulent checks into his various accounts, totaling $269,679.78.

Gilchrist concedes that, "[i]ncluded in the Guidelines' alternate methods of calculating intended loss is the tallying of deposited fraudulent checks. *See* U.S.S.G. § 2F1.1, cmt. n.8." Nevertheless he asserts that, "while the district court may calculate intended loss in this manner, the court was not obligated to do so." He implies that the district court adopted the recommendations in the PSR without examining the proof.

On the contrary, the district court explained its reasoning:

> I received a copy of the spreadsheet that was used by the investigating authorities to track the checks that were written in connection with the check-kiting issues. And, that, I think, is adequate for me to understand what the intended loss was.
>
> So I am going to overrule the objections here, because I do think I have a factual basis to make those findings with sufficient specificity to satisfy the needs—the needs of sentencing.
>
> As you know, it's a range that the issues need to fall within. In this case, I'm being requested to sentence at a $200,000-plus range. This shows 280- or 90,000, maybe it's not quite that, but in any event, it's substantially over 200, so I feel like there's enough information, and I'm not ordering any changes [to the Pre-Sentence Report] there. . . .
>
> [W]ith respect to the guidelines, the Defendant has objected to the total intended loss, which generates an eight-point increase, and that objection is overruled.
>
> I think the information that's been provided by the —to the Probation Officer by the government in its papers is adequate to demonstrate the intended loss.

It only needs to be approximate. And for sentencing purposes, it only needs to be over $200,000, which I find it clearly is. . . . I think the evidence is adequate.

One other point Gilchrist raises is that he had a pattern of withdrawing less than the total amount he had deposited with the fraudulent check. Nevertheless, as he conceded, "if an intended loss that the defendant was attempting to inflict can be determined, this figure will be used if it is greater than the actual loss." U.S.S.G. § 2F1.1, cmt. n.8; *see also United States v. Robinson*, 94 F.3d 1325, 1327-28 (9th Cir. 1996) (affirming the district court's calculation of loss amount as the full value of the counterfeit credit cards and rejecting the defendant's contention that there should be no loss enhancement because there "was never any possibility of loss occurring as a result of their sale of counterfeit credit cards to government agents"); *United States v. Gallagher,* 99 F.3d 329, 334 (9th Cir. 1996) (affirming the district court's calculation of loss amount as $3,000 where the defendant deposited two fraudulent checks totaling $3,000, but withdrew only $1,000).

**[2]** Because the district court applied the correct legal standard and relied upon probative evidence submitted by the government, we hold it did not err in calculating the intended loss as being over $200,000.

### III.   U.S.S.G. § 3C1.1

Counts 11 and 12 of the Indictment charged that Gilchrist fraudulently withdrew $8,000 and then $8,750 from two different Wells Fargo accounts that did not belong to Gilchrist, one on February 28, 2000 and one on February 29, 2000, Gilchrist pleaded guilty to these counts.

These are the transactions where Gilchrist attempted to evade detection by filing fraud claim reports to Wells Fargo,

saying the transactions were actually made by a thief who had broken into Gilchrist's car and stolen his wallet, identification, ATM card, and Wells Fargo bank information. When Wells Fargo investigated and rejected his claims, he then sued Wells Fargo. Wells Fargo contacted the FBI in June 2001 to commence an investigation, five months before Gilchrist committed perjury during his deposition.

Here again, Gilchrist asserts that the district court just applied the enhancement sought by the government without considering the evidence.

Here again, the district court did clearly explain its reasoning at the hearing:

> And the Government has pointed to and the Probation Officer has pointed to, among other things, the perjury committed in connection with the litigation with Wells Fargo. And I think that qualifies as obstruction under the guidelines. So, I do intend to add those two points. . . .
>
> What happened with Wells Fargo is very serious. It takes a lot of time and energy for people to sort those things through. The fact that there was a lawsuit filed on—on a fraudulent basis is—this is all going very, very far with something for which there's just no—no excuse, in my view.

The Guidelines provide for a two-level enhancement if "(A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (I) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense." U.S.S.G. § 3C1.1.

The district court reasoned that a defendant obstructs justice when, during the pendency of an FBI investigation, he engages in extensive perjury to blame his own criminal fraud on an unknown thief, regardless of whether those false statements were made directly to law enforcement. Perjury for purposes of a § 3C1.1 enhancement has the same requirements as the federal perjury statute, 18 U.S.C. § 1621, and requires proof that "[a] witness testifying under oath or affirmation . . . [gave] false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *United States v. Dunnigan*, 507 U.S. 87, 94 (1993) (emphasis added). Here, the record demonstrates that Gilchrist willfully intended to provide false testimony to confuse Wells Fargo. He even admits it.

**[3]** Gilchrist asserts that because section 3C1.1 applies only if "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution or sentencing of the instant offense of conviction," the defendant must know about the criminal investigation before he commits perjury. He asserts that he did not know the FBI was already investigating him at the time he committed the perjury, so section 3C1.1 should not apply. Gilchrist certainly knew Wells Fargo was investigating these transactions, which he has now admitted were fraudulent, and he was attempting to impede its investigation by asserting that the withdrawals were made by a thief, and then by suing Wells Fargo and committing perjury to obstruct the investigation into his fraud. Because Gilchrist willfully provided false testimony under oath after the FBI had initiated its investigation, and his perjury directly involved two of the counts of which he was convicted, the district court properly applied the § 3C1.1 obstruction enhancement.

Gilchrist raised this issue in his sentencing memorandum and at the Sentencing Hearing. Thus, on this issue, we review

for abuse of discretion. *See Robinson*, 94 F.3d at 1327. When reviewing a district court's decision for abuse of discretion:

> [W]e first look to whether the trial court identified and applied the correct legal rule to the relief requested. Second, we look to whether the trial court's resolution of the motion resulted from a factual finding that was illogical, implausible, or without support in inferences that may be drawn from the facts in the record.

*United States v. Hinkson*, 585 F.3d 1247, 1263 (9th Cir. 2009) (en banc), *cert. denied*, 131 S. Ct. 2096 (2011).

**[4]** While we have not ruled on whether a defendant must have knowledge of an investigation to obstruct or impede the investigation, the district court's application of § 3C1.1 is in line with our circuit's precedent and the holdings of most of our sister circuits.

**[5]** No case in this circuit is directly on point because each of the cases on this issue relate to a civil investigation by a governmental investigative agency, which then led to criminal investigations. Nevertheless, several cases have recognized that a § 3C1.1 enhancement is properly applied where the defendant makes false statements in civil administrative proceedings conducted by a governmental investigative body that eventually resulted in criminal charges.

In *United States v. Luca*, 183 F.3d 1018, 1020-21 (9th Cir. 1999), this court affirmed the district court's application of U.S.S.G. § 3C1.1 based on the defendant's submission of false documents in state administrative proceedings investigating mail fraud, interstate transport of stolen property, and securities fraud. In *Luca*, the defendant submitted false prospectuses in response to a subpoena from the state agency that was investigating the same Ponzi scheme which ultimately formed the factual basis of the defendant's federal conviction.

*Id*. at 1021-23. Likewise here, when Gilchrist repeatedly made false statements under oath, Wells Fargo and the FBI were investigating the transactions that formed the basis of both Gilchrist's fraudulent civil lawsuit and ultimately his convictions on Counts 11 and 12. Thus, as in *Luca*, and as required under § 3C1.1, Gilchrist's "obstructive conduct related to . . . the defendant's offense of conviction." U.S.S.G. § 3C1.1.

In *United States v. Yip*, 592 F.3d 1035 (9th Cir. 2010), the defendant filed false tax returns and then submitted four false promissory notes and a false bank deposit during a civil IRS audit. *Id*. at 1037. This court affirmed the imposition of a § 3C1.1 enhancement, holding that "Section 3C1.1 itself does not define an 'investigation.' . . . We found it significant in *Luca* that the agency was investigating 'the same offense' that led to the defendant's federal conviction." *Id*. at 1042 (quoting *Luca*, 183 F.3d at 1022). So too here, Wells Fargo was investigating the same offense that led to a federal conviction.

**[6]** Each of the other circuits that have resolved this issue held that no awareness of the criminal investigation is required. In *United States v. Jenkins*, 275 F.3d 283, 285-86 (3d Cir. 2001), the defendant was convicted of being a felon who unlawfully possessed firearm ammunition and was given an enhancement of two levels under § 3C1.1. The Third Circuit reversed and remanded for resentencing based on the facts of the case, *id*. at 291, but broadly held that the defendant did not have to be aware of the federal investigation into his crime. *Id*. at 287-89 ("Jenkins contends the guideline requires an awareness on his part a federal investigation had begun. The term 'awareness' does not appear in U.S.S.G. § 3C1.1. Nor do we believe that it can be properly implied. . . . Without further guidance from the Sentencing Commission, we will not write in a requirement that the defendant be aware of the federal investigation."); *accord United States v. Brown*, 237 F.3d 625, 627-28 (6th Cir. 2001) (holding that a two-level increase for obstruction of justice under U.S.S.G.

§ 3C1.1 applies under the sentencing guideline "where a defendant engages in obstructive conduct with knowledge that he or she is the subject of an investigation or with the correct belief that an investigation of the defendant is probably underway"); *United States v. Oppedahl*, 998 F.2d 584, 586 (8th Cir. 1993) ("We believe that the term 'willfully' should be reserved for the more serious case, where misconduct occurs with knowledge of an investigation, or at least with a correct belief that an investigation is probably underway."). On the facts of this case, given that Gilchrist knew Wells Fargo was investigating his fraudulent actions (indeed, he himself had begun one of the investigations by filing a fraudulent report that someone else had stolen money from his account), we conclude that he had to have at least known that a criminal investigation was probably underway. In fact, Gilchrist's efforts to cover up his fraudulent conduct in the civil case could also be construed as an attempt to perpetrate a larger cover up to avoid criminal liability.

  **[7]** We, however, have held that if a criminal investigation is not actually pending, then steps taken to conceal the facts do not amount to an obstruction of justice. In *United States v. DeGeorge*, 380 F.3d 1203, 1210, 1223 (9th Cir. 2004), we held that the § 3C1.1 enhancement did not apply to perjury committed during a civil suit between a defendant and his insurance company, where the criminal investigation of the defendant's mail fraud did not begin until after the civil suit ended. Thus, the perjury could not be construed as "an obstruction offense" because the text of § 3C1.1 requires that "the perjury . . . occur *during* the course of the [criminal] investigation." *Id*. at 1222 (internal quotation marks omitted) (citation omitted). We did not, however, cite the fact that the perjury was committed during a civil investigation, as opposed to a criminal investigation, as one of the reasons for reversal. Similarly, in *United States v. Rising Sun*, 522 F.3d 989, 992, 995-96 (9th Cir. 2008), we held that the § 3C1.1 enhancement could not be applied to a murder defendant who, on the night of the killings, had attempted to destroy evidence

and had threatened his brother to keep him from talking to his girlfriend about the night's events. "The enhancement could only apply if an investigation or prosecution was already in progress when the obstructive actions were taken." *Id.* Here, however, unlike in *DeGeorge* and *Rising Sun*, the criminal investigation had already begun before Gilchrist committed perjury.

In *United States v. Martin*, 287 F.3d 609, 613, 617-18 (7th Cir. 2002), the defendants were convicted of conspiracy to distribute cocaine and were given a two-level enhancement under U.S.S.G. § 3C1.1. The Seventh Circuit affirmed the conviction and sentence, again finding that the term willfully simply meant that the defendants needed to have taken the actions deliberately, not that the defendants needed to have known about the criminal investigation. *Id.* at 618-19 ("knowledge of an investigation is not required for a 'willful' violation to occur" because "[t]he term 'willful' does not mean 'knowing,' or 'aware,' it means 'intentionally' or 'deliberately.' "). *Accord United States v. Brown*, 237 F.3d 625, 628 (6th Cir.), *cert. denied*, 532 U.S. 1030 (2001) (holding that a two-level increase for obstruction of justice under U.S.S.G. § 3C1.1 applies "where a defendant engages in obstructive conduct with knowledge that he or she is the subject of an investigation or with the correct belief that an investigation of the defendant is probably underway"); *see also United States v. Lister*, 53 F.3d 66, 70 (5th Cir. 1995).

The First Circuit even held that false documents submitted to Medicare auditors justified a two-level enhancement under U.S.S.G. § 3C1.1, even though the criminal investigation had not even begun yet. *United States v. McGovern*, 329 F.3d 247, 247, 251-53 (1st Cir. 2003).

**[8]** We find the official commentary to § 3C1.1 instructive:

> Obstructive conduct that occurred prior to the start of the investigation of the instant offense of conviction

> may be covered by this guideline if the conduct was purposefully calculated, and likely, to thwart the investigation or prosecution of the offense of conviction.

Section 3C1.1, comment n.1 (2010). The Eleventh Circuit agrees, and, contrary to our holdings in *DeGeorge* and *Rising Sun*, has gone so far as not to even require that a criminal investigation be underway:

> Because there is no requirement that a defendant be under arrest or know he is being investigated at the time he commits obstructive acts, and the defendants failed to request that the district court make more specific findings in addition to those contained in the presentence investigation report, the district court did not err in applying a two-level obstruction-of-justice enhancement.

*United States v. Wayerski*, 624 F.3d 1342, 1352 (11th Cir. 2010) ("The Guidelines' commentary specifically provides that '[o]bstructive conduct that occurred prior to the start of the investigation of the instant offense of conviction' may be covered by the Guideline.").

**[9]** We agree with our sister circuits that "willful" means only that the defendant have engaged in intentional or deliberate acts designed to obstruct any potential investigation, at the time an investigation was in fact pending; it does not mean the defendant had to know for certain that the investigation was pending.

**AFFIRMED.**